Good morning, I'm Lawrence Padway representing Dr. Fadi Haddad. The ERISA plan has the burden of showing an exclusion from coverage and the rules are well settled, the exclusions are narrowly construed, they have to be clear, plain, conspicuous, they're construed against the insurance company. And the pre-existing condition in this case is a right arm problem caused by a pinching of the nerve that exits the spine on the right side at the C5-6 level, travels down into the thumb, causes symptoms all along that direction. Now, just so I understand the medical situation, but the disc that was replaced is one disc that affects both the left and right side. That's correct. There's one disc and there are two nerves. There's one, there's the right nerve and there's the left nerve. So, if we look at this anatomically from the standpoint of the disc, the disc is removed in the surgery on March 5th, so that's gone. So, to the extent that the pre-existing condition is... But it's removed and replaced and their may... The disc, the degenerative disc, is the pre-existing condition anatomically. That's gone. It's removed. So, they put an artificial disc in to replace it, but that's not a pre-existing thing, that's a new thing. And that's put in after the end of the look-back period, so a problem from the artificial disc is not a pre-existing condition. Any problem associated with the artificial disc should be covered because that didn't happen... That was after the end of the look-back period ends in about January and the surgery's in March. What they're saying was a pre-existing condition was... Was removed. Okay, go ahead. Okay. So, you know, whatever happens after that is not a pre-existing condition. If you look at it symptomatically, the pre-existing condition is all in the right arm. And post-surgery, it's all in the left. Well, it wasn't in the left, it was in the middle, and that's why I was trying to clarify this. The surgery was in the middle, it wasn't in the left. It was to correct a problem on the left, but it was in the middle. Well, yes, right. The surgery's in the middle, but the surgery takes place after the end of the look-back period. So... Are you... Let me interrupt. Are you talking about the fusion surgery or are you talking about the... The first surgery. The herniated disc surgery. That was the first surgery. The herniated disc surgery. And what month did that occur? Was that in March? That's March. And the look-back period ends in January. Okay? So... But, so the ultimate question is, I mean, you have a letter in the record from the doctor on the appeal, and the letter says that there's no evidence of any left-side symptoms. It appears that these were caused by and related to the surgery done on that date. Yes. Right? And he also says that it was the replacement disc was flexed, which is not normal, and that's when he got these left-side symptoms. So, I mean, in one... So the real question under the policy, which I understand isn't really the policy, but I guess we're all assuming that this is the controlling language, is whether it was caused or related to the original precondition. Whether it results from, is caused, or contributed to by the preexisting condition. Right. And that's where the plan goes. And in one sense it was, because none of this ever would have happened if it wasn't for the preexisting condition. Right. So the question is sort of approximate cause-like issue. Exactly. I mean, Dr. Haddad could have been run over on his way to a doctor's appointment, and you'd have caused by it. But if you read this language, it says, we will only pay benefits under the policy for any disability that results from or is caused or contributed to by a preexisting condition for up to six weeks, etc. So, the purpose of this language is to say that if you have a disability that results from a preexisting condition, you know, we're not going to pay it. But it doesn't say that if you have a preexisting condition, and that leads to some other non-preexisting condition, that they won't pay it. Well, you're essentially arguing what we would call in a tort case an intervening cause, right? Yes. And the question is, how is that treated under this policy? Well, it has to be, it's treated under the reasonable expectations doctrine, and it's narrowly construed. It's construed against the insurance company. What about the Dowdy case? Do you think that's informative here? Somewhat. Obviously, I emphasize that in the reply brief, mostly because it was the new case. I mean, and Dowdy says, well, yeah, there is some limit here. It has to have a substantial contribution, but I'm not sure that advances, how much that advances to the ball. But I think that there's a better way to look at this. The policyholder's expectation, you know, is when Dr. Haddad gets the policy, he has a problem with the right arm. He knows he can't get that insured. The insurance company, you know, if they were doing individual underwriting, would write an exclusion for the right arm. But he, in fact, does apply for the disability with regard to the right arm before the left arm thing disappears, appears. Right. And there's limited coverage. There's six weeks coverage on the right arm. Right. But the left arm is something he would expect to be covered, because when he gets the policy, there's no problem with the left arm. You know, if the surgery had caused an injury to his leg, would his leg not be covered? Let me ask you something. Suppose that this disc had operated exactly the way it's supposed to operate, i.e., it hadn't flexed, but nonetheless a problem with the left arm appeared for some reason. Would then it be covered or not? Does it matter that the- That the disc flexed? I don't think so. Really? You don't? No, I don't think so. I think the issue- But doesn't it have to be something that isn't expected? If it were a sort of known likelihood that it could cause something on your left arm, you're just taking a chance, even if it goes right, completely right? I think, you know, in this new order that came out in Ohio that I filed yesterday, you know, the judge said there's a distinction between a preexisting condition resulting in a disabling condition and an unexpected complication arising after a preexisting condition treatment. That's what I'm trying to say. It has to be at least in some sense unexpected, i.e., not normal. No? So, yeah. And, you know, when you get medical treatment, the expectation is that you'll improve. I mean, that's why you do it, right? Well, yes. I mean, any time you get this kind of result from a medical procedure, it's unexpected, it's abnormal. And, you know, I mean, the first part of the Hippocratic oath is- I mean, if you do a back fusion, it may or may not fuse, just as a matter of- Right. Right, not because anybody does anything right or anything wrong or anything unusual happens. Right. So, in that instance, it seems to me that causation is a lot more direct than if something doesn't operate normally. Well, yes. And, clearly, I mean, this is an unusual result, and I don't think anybody has a good explanation for exactly what happened. But- I thought that Dr. Tay's letter was quite specific, though. Well, it is. He doesn't say why it flexed, but he does say that's what caused it and it's not normal. Right. And- But, you know, I mean, did this occur while they were taking the disc out, putting the new disc in? You know, I don't think anybody knows. But what we do know is that you don't normally go in for this kind of procedure and have the right arm fixed and the left arm go bad. I mean, that's- You know, I'm not suggesting anybody was negligent. Was this something that was inevitably going to happen because of this, whether he had the surgery or not? No. And that, I think, is the critical issue, because it is a process of nature rule in disability cases where you do expect certain kinds of conditions to progress. And if they do, well, you know, then that would make sense to say, well, that's still a preexisting condition. And I think that we cited the cases on that. Well, those cases are all about something else. They're about a statute of limitations problem or something like it. Well, that's right. They're about a different kind of limitation. But it's a concept of, you know, imagery- But what I'm getting at is trying to- Natural progression. What I'm getting at was, is this a substantial factor to the ultimate loss, to the ultimate issue? Was the operation a substantial factor, or was this just a complication? Well, I mean, I think the operation- I mean, there's a complication, a surgical complication of some kind, and that certainly is the predominant factor in causing the problem with the left arm. I mean, if you don't have the surgery, you're not going to have the left arm problem. And that's what's disabling. And the question- Do you want to reserve time? Yes. Okay, thank you. Thank you. Good morning, Your Honors. Michael Bernacchi for Pele, Harvard Life and Accident Insurance Company. I think, just to address one of Mr. Padway's arguments, the preexisting condition clause has two aspects to it. It's an application clause, and then it's definition. You know, for the purpose of this argument, I would concede that the cervical- that the symptoms that he had on the left side are new, but the application of the provision says that if the preexisting condition causes or contributes to the disability, you're limited to six weeks of benefits. In this particular case, I think it's important to understand how the left symptoms came about. As the district court found, all of the facts are undisputed in this case. Dr. Haddad had C5-C6 cervical disc disease. It was preexisting as defined by the policy. The condition got worse. In March of 2015, he had decided to undergo a disc replacement surgery. Okay. Can I just stop you there for a minute? Yeah. In Dowdy, and this may be typical, I don't know, the provision specifically identified treatment as part of the causation chain that counted. This one doesn't. Does that matter? It doesn't, Your Honor. I think most of them, most of the policies don't, and most of the decisions we cited didn't identify treatment, actually. What the courts are looking at is, just like you did in Dowdy, was is it a substantial cause? But it was because, I mean, it was in that instance the fact that treatment was identified. I mean, without treatment being identified, you at least have one more large hoop to get over in terms of the causation, chain of causation. Well, that's one issue. And I think in a certain unique circumstances, basically, you would be right. I don't think it's the facts of this case. And I think the other thing about putting treatment in there, if the insurance companies start doing that, you're going to preclude a lot of insureds who otherwise would deserve coverage, and they wouldn't be able to get coverage, because so I think it's better to analyze. But to me, I don't understand that. You're saying it's in there anyway, even if it's not in there. I'll give you an example. In Fott, it's one of the cases out of the Tenth Circuit, basically. The court adopted a substantial contribution to the test. Had the insurance company put a treatment exclusion in there, she wouldn't have got benefits. But you're saying that the treatment exclusion is in there anyway. I mean, you're saying that even though it doesn't say treatment, the fact that he chose to undergo this surgery to correct the preexisting – the surgery is not the preexisting condition.  So you're saying that even when the policy doesn't say that the treatment can't itself – doesn't cut off the substantial cause, you're saying it doesn't. The treatment is just part of the chain of causation. Well, I think you look at it, and each individual case is different. As the district court found in this particular case, Mr. Padaway argued that, for instance, what if somebody undergoes treatment? What the district court found is really irrelevant. This is summary judgment, right? What's that? This is an ERISA case on the administrative record. Right. So therefore, what difference does it make what the district court found? Well, I mean, it depends on what panel I'm appearing before. Sometimes they basically find that the district court making findings of fact, they have to give deference to. It doesn't make a lot of sense, because he's making – I know this is kicking around, but these are – And I've argued it both ways. Yes, the same record that we do. So go ahead. But that being said, to get back to the point, and I think what these cases are doing is they're analyzing it on a case-by-case basis. In this case, he had right arm symptoms. He underwent a disc replacement surgery. He had a defective C5-C6 disc. Under the surgery that he underwent, you make an incision in the top of the throat, you insert instruments, you cut out the defective disc, then you insert and place the artificial disc there. And Mr. Padaway indicated that maybe the disc flexed. That's been Mr. Padaway's argument. Well, you don't have anything else, because you do no medical investigation. I mean, your client did absolutely no medical investigation. You didn't have an IME. You didn't have another doctor looking at him. We didn't need to in this case, just for this very reason. We accepted what Mr. Padaway's specialist said. Right. So therefore, that's the record. Yeah. Dr. Tay. Okay. So you can't go say it's what he said. It's the record. That's all there is. But we accepted that. But what Dr. Tay said was not that the disc flexed, that somehow the nerves were injured, basically, during the operation. He did say very specifically that it flexed, that was not normal, and that caused the problem. No. Actually, he basically said, and let me try to find that. And I'll find that for you. But I think what he actually said. It's on page 914 of the record, ER 933. And he said that the, that the, I'm trying to find. If I can. This isn't the right one. If I can. Go ahead. I gave you the wrong page, but go ahead. No, I'm sorry. What had happened is, originally, the disc looked like it had flexed a little bit. His original surgeon brought in consultation, had a consult with the manufacturer and other physicians, and they determined that the disc was within normal limits. What Dr. Tay said was, and this is on 934, it's the last paragraph, it appears that there was a left-sided nerve root injury which occurred during the March 5th, 2015 disc replacement surgery. That was the cause of the new problem, basically. And he earlier said that the post-surgery x-ray showed that our placement disc was flexed, which was not normal. But then it goes on to say, on consultation with industry experts, the surgeon felt the disc placement was adequate. Right, but not normal. Well, actually, if you go back in the record, we cited other pages in the record where they say it's basically within normal limits. Okay. But what Dr. Tay says is during this disc replacement surgery, when you're removing either you're removing the disease preexisting disc or you're inserting the artificial disc, somehow the left-sided nerve was injured, basically. That is a common consequence of these surgeries, as Dr. Tay said. How do we know that? Because I think, obviously, we cited certain medical treatises to the court. All they said is it's a possible risk. When you read the pieces of paper, you get about risks. So when you take surgery, I mean, there are all kinds of risks. No one said it's common. Well, I think there's a couple of things. We cited certain sites. There was a consent form Dr. Haddad filed. Was common? I don't know if it's common. No, you just said it was common. It's expected. I'm sorry. I didn't say it was expected either. You said it was a risk. Anticipated risk. I'm sorry. You didn't say it was anticipated. You just said it was a risk. Known risk. Okay. I'm sorry. Known risk. But if you follow that line of argument, then how is that different than the Fott case, the one you just cited? Was that the Tenth Circuit case with the person who undergoes heart surgery and then develops a staph infection? Yeah. And I think in Fott, it's different. And we made that argument underneath. What the court found in Fott was that there were several intervening causes. In that particular case, she had ventricle disease, and she underwent an operation. Actually, because of a defective sternum, they had to use an unusual wound-closing mechanism. She left the hospital without any type of infection. Three weeks later, the wound burst open, and she developed an infection. The court specifically said in that case, given the attenuated circumstances between the preexisting condition and the new disabling condition, which was the infection, we're not going to basically apply the preexisting condition. Well, I mean, what about the Dowdy case in its discussion of the difference between philosophical cause and, you know, practical cause? I mean, if you asked, I would think, most people in the world, you know, what caused this problem, they would say they wouldn't say it was the preexisting condition. They'd say it was the surgery, and particularly something that happened in the surgery that wasn't usual. I would disagree. I think most people would say a substantial cause was the removal of the defective disc in trying to put in the official disc. Yes, but that's not the preexisting condition. The defective disc is. This is where I started from. You're jumping through the treatment as if it's not at least an attenuation of the causation chain, and as if it was the preexisting condition. It was not the preexisting condition. It was something that happened that affected the preexisting condition, but it wasn't the preexisting condition. Well, and they addressed that in Fott, and they acknowledged that medical treatment isn't the preexisting condition. What you're still going to do, though, is apply this substantially contributed to you, Tess. But you now have an attenuated cause to begin with, which is that the — it's the surgery that's the problem, not the preexisting condition. I'm not saying that's an absolute cutoff, but then if the surgery doesn't go — does something that is at least unusual, at that point you have a second level of attenuation, and the question is where's the cutoff? Well, I mean, I think the argument here is that, you know, what's the impact? There's no other intervening causes that could have caused these left-sided symptoms that he is now claiming is disabling him. The simple — Counsel, if Judge Gould, if I can interject a quick — to address at some point, although I don't want to impede your answer to Judge Berzon, so — No, go ahead. — I'm going to finish that. No, please go ahead. My question is this. It may be a totally unfair question, because I may not fully understand these concepts, but would — I'd like your perspective, as I think about — would you say this case is controlled more by traditional principles relating to causation, such as proximate cause, or controlled more by the principles of insurance law that govern how we should interpret an exclusion? I would say it's governed by ERISA federal common law, and the court just issued a decision, the Dowdy case, which I believe Judge Berzon was on the panel, which said it's a — what you have to do is apply a substantial contribution test. Okay, thank you. And again, I mean, I think if you look at — we had this discussion down below, and I think the issue is, is if this woman would have undergone the coronary artery disease operation, and for some reason it was clearing the left ventricle, and all of a sudden the right ventricle, because of the surgery, didn't function as well, or she started having cardiac arrhythmias, I think you would have had a different result. I think the court would have said it was — No, it would depend what the connection was between the two. And the connection between the two here is apparently that he — his preexisting condition was definitely on the right side, in the sense that the — whether or not it was caused by the single disc, what — the chain of causation there was that the nerves were being impaired on the right side, right? Exactly. Nothing was bothering him on his left side that was — I forget what the term is, but there was no closure of the nerves and — of the nerve routes, and there seemed to be no problem on his left side. It's a little odd to say that he now has a preexisting condition on his left side, when he had no condition on his left side to begin with. Well, again, it's — the focus is the disease disc, and the issue is whether the preexisting condition substantially contributed to the new symptoms on the left side. The actual condition didn't. The only thing — the actual condition didn't. Had it been left alone, he never would have gotten any problem on his left side. You're right. But if you have this hard-and-fast rule, which Mr. Padway seems to be claiming, which is that any treatment, basically, for a preexisting condition that results in different symptoms can't — basically renders meaningless the preexisting condition exclusion, you're going to have cases like — I think it's Topian and Breen, where the individuals underwent back surgery and claimed that they have different symptoms now. What do we do with the fact that you have — because the insurance company did no medical investigation — that's accurate, right? That's accurate. Well, we determined it was a preexisting condition, but yes. Right, but you never tried to figure out or demonstrate that this — that this was going from a, let's call, normal version of the surgery to his left-sided problem, as opposed to something that went wrong in the surgery. Do you think it matters whether something went wrong in the surgery or not? I think if it's basically — if it's — again, if the surgery substantially contributes to the new symptoms, basically, I don't think it necessarily matters. Even if nothing went wrong? I'm sorry, what? Even if it was just exactly the way it was supposed to go? If it exactly went the way it was supposed to go, yes, I think that it would still substantially contribute. I mean, but if it wasn't exactly — I'm sorry. If it wasn't, basically. If it wasn't. I still think it would be. I think there's going to be intervening causes. I don't disagree. Again, Fott's a good example, basically, of where the Tenth Circuit came in and said, lookit, we're not going to find this substantially contributed because the circumstances were too attenuated. But they did look at the causal chain and looked at all the other factors that went into how she became disabled due to a staph infection. I do think the district court was right, and I think it's very dangerous if we start saying, basically, medical treatment that results in different symptoms does away with the pre-existing condition clause because people are going to — What about the fact that there was no lesion on the left side of the C6 — there was no C6 lesion present on images done when he had the herniated disc surgery, but then after the fusion surgery, then you had the lesions on the C6. And, again, spinal cord — a risk injury to the spinal cord is a known risk of this particular surgery. Is this an injury to the spinal cord, by the way? What's that? What makes this an injury to the spinal cord? Well, or the nerve, basically. I mean, the nerves associated with the spinal cord. But, I mean, my point, again, is this, is, again, if you look at this operation, this is a little bit different. You're talking about removing the pre-existing condition, the disc, either while it was being removed — and it could have happened while it was being removed, as well. What is the record on the question of how this risk was connected to the standard? There is none because you didn't do any medical — you have no medical expert on your side. We basically accepted both his treating physicians who said that this injury occurred, not afterwards, not because the disc was less, but during the operation. I understand that, but they didn't say that it was a likely risk more than, you know, 0.0% risk. They didn't say anything. Oh, I see what you're saying. You're talking about the risk, whether we assess what was the risk. But I really don't think that matters because it's an issue — Really? I don't. I think it's an issue of substantial contribution, basically. And I can't see how you can — No, even if the record — if we knew that in 0.001% of the cases this could happen, that wouldn't matter. I would say yes. I mean, what if you have a knee replacement and your preexisting condition is knee — is pain below the knee, and then all of a sudden you have a knee replacement and you're going to argue, well, I now have pain on top of the knee, and therefore it's not a preexisting condition. I mean, I think it's very problematic if you start saying treatment is an intervening cause. It doesn't make any difference whether the likelihood of the above-knee problem is 0.5% or 0.001%. No, I don't think it does. I think what you have to look at is what are the other concurrent causes, basically. And in Fott, they looked at all the multiple concurrent causes that led to the result. Here there was only really one circumstance. It was the surgery. Everybody agrees. Once you start to see that it's the surgery — But we don't know anything about the connective — either we know what's in Dr. Tay's letter, which was that it was the non-normal flexing of the disc, or we don't know, because you didn't — you didn't bother to find out. Dr. Tay's letter doesn't say it's the non-normal flexing. Dr. Tay's letter at 934 says there was an injury to the nerve, basically, during the surgery. He's very specific about that. And that's — it's at the end. Yes, there was a left-side nerve root injury which occurred during the surgery. Okay. But he doesn't say — you don't know how it came about, because you never bothered to find out. I didn't know. I don't know how. I mean, the insurance company did no inquiry into what the connective was. Well, we know it was connected to the surgery. The surgery to remove — So that's — so your ultimate position is, as long as it came about because of the surgery, it doesn't matter how unlikely it was or what the — what the mechanism was that caused it. It makes no difference. Well, I think every case is judged on its own merits. But in this particular case, the surgery was to remove the preexisting defective disc. They literally cut it out and inserted an artificial disc in there. Okay. Okay. All right. Thank you very much. Your time is up. Sir, do you have anything more? Thank you. There's a big value in having insurance policies that everybody understands what's covered and what's not. There's no reason in this situation to have to parse through fact by fact, case by case, and have different outcomes depending upon different decision makers. The insurance company — So you're taking a per se position as well? Well, yeah, I do. And because in doubt — What's your per se position? Well, in doubt, they excluded treatment. I'm sorry, but that's not true. In fact, in Dowdy, as I said, the provision in the policy specifically included treatment. I'm sorry. I said that backwards. But the point is, the policy specifically discussed treatment and how that worked. And here we have a policy where they're implying a new term on treatment. And all they have to do is just write what it is that they want to cover. If they don't want to cover surgical treatment and whether the problems are common or uncommon or whatever, all they have to do is describe it. And instead, what they have is language which nobody can understand. And so what we're left with is, what does a reasonable layperson think is covered? And if that's how they want to write the policy, then a reasonable layperson is going to assume that some surgical misadventure, whether for whatever reason, that they're covered for that because they started out with something on the right side and they ended up with something on the left. Okay. Thank you very much. Thank you. Thank you both for your argument. The case of Haddad v. SMG long-term disability plan is submitted. The last case, Sung v. MTC Financial, was submitted on the briefs. So we are in recess. Thank you very much.
judges: Gould, Berzon, Marquez